## Owens v. Hondell, et al.

## Hondell, et al. v. Johnson-Magoffin Petroleum Company

(Decided February 16, 1926.)

### Appeals from Johnson Circuit Court.

Sales—Evidence Insufficient to Authorize Finding of Breach by Seller in Failure to Assign Drilling Contracts.—In action by seller of drilling machinery and contract to drill, finding in support of. counterclaim for alleged breach of contract in failure of seller to assign certain other contracts to drill wells held not sustained by evidence.

COMBS & COMBS and WHEELER & WHEELER for appellants in first case.

Z. W. WELLS for appellant in second case.

WELLS, VAUGHAN & VAUGHAN for appellee in both cases.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing first case and appeal in second is denied.

J. M. Owen sued F. M. Hondell in three separate actions in the Magoffin circuit court in which he sought to recover (1) on a note of $1,000.00; (2) on a note of $3,300.00; and (3) on an item of $325.00 on account. In the first two actions he also sought to enforce a mortgage lien on certain drilling rigs and machinery. The defendant in his several answers pleaded that the consideration for the notes was the sale to him by plaintiff of certain drilling machinery and an agreement to assign to him two drilling contracts, the first contract being to drill two test wells on the Enoch Bailey lease in Magoffin county operated by the Magoffin Petroleum Company; the second contract being to drill three deep test wells on the Hopkins lease in Floyd county operated by one Johnson; that in fact plaintiff had no contract for the Hopkins wells and failed to assign such contract to defendant and that by reason of this breach of contract he was damaged in the sum of $4,500.00. A number of smaller claims were set up and all of these matters pleaded as a counterclaim. In the third suit he pleaded that he completed a well which plaintiff had begun for the Magoffin Petroleum Company on the Enoch Bailey lease, but that plaintiff was indebted to that company in the sum of $325.00, which it had withheld. He denied his liability for this, but made the petroleum company a party on cross-petition and asked judgment against it in the event plaintiff recovered this item against him. Issues were joined in the pleadings and the cases tried and heard together. The lower court found for plaintiff the amount of his notes and interest, but on the other hand found for the defendant in the sum of $4,500.00 damages for failure to assign the defendant the contract for drilling the test wells on the Hopkins lease. It also found the $325.00 item mentioned above in favor of defendant, together with a number of smaller items; the total finding in favor of plaintiff being $4,996.56, and that in favor of defendant being $5,378.48, which left a balance of $381.92 in defendant's favor and for which it rendered judgment against the plaintiff. Plaintiff appeals.

The cross-petition against the petroleum company was dismissed and the defendant asks this court to grant him an appeal against that company if the item of $325.00 is found in plaintiff's favor.

The facts are: In the month of May, 1921, plaintiff owned a complete rig and set of drilling machinery which he was operating on the Bailey lease under a written contract to drill two test wells at a price of $3.00 per foot, the first of which was down about six hundred feet, and upon which he had drawn $1,400.00. He also had some tools, but not a full set on the Hopkins lease upon which he had drilled two test wells under a contract of $2.25 a foot, with water and fuel furnished, and other conditions not necessary to set out. The operator also proposed to drill three additional test wells on that lease, but had not contracted with Owens in reference to them.

At that time and under the circumstances stated, Owens by verbal contract in consideration of Hondell's promise to pay him $8,000.00, sold both rigs to Hondell and assigned to him the contract to complete the two wells on the Enoch Bailey lease. As to this there is no dispute. The chief issue being over the alleged assignment of the right to drill the wells on the Hopkins lease.

Hondell made various payments to Owens during the year 1921, and the early part of 1922, reducing his debt and interest, exclusive of the $325.00 item to $4,300.00, and on the 4th of March, 1923, executed the two notes in contest, one for $1,000.00, and the other for $3,000.00. The first was secured by personal surety, and a mortgage was given on all of the drilling outfit to secure both. He continued to make payments on the notes and made no complaint of the failure to procure the contract for drilling the wells on the Hopkins lease until the filing of his answer and counterclaim in this suit in October, 1922, eighteen months after the contract had been made.

He testified that the two rigs were of the reasonable value of $5,500.00; that at the time of the purchase Owens represented to him that he had a contract for three deep test wells on the Hopkins lease at $2.25 a foot and agreed to give him his rights therein, this being a material part of the consideration in the purchase contract; that the Hopkins lease was owned by a nonresident, ———— Johnson, and his agent in charge was ———— Fleming; that he made repeated requests of Fleming to give him that contract but was put off from time to time until finally it was given to another person; that he has had much experience in drilling operations and has drilled a number of wells in this territory; that his profits on

the proposed wells if drilled would have been $1.00 per
foot, and their average depth 2,000 feet. The reason
he did not make complaint before was that he believed
that he would get the contract to drill the other wells up
to the time the contract was given to another, and also
at that time he thought he would have to pay his obliga-
tions, and then bring an independent action for the
breach of contract, and did not learn otherwise until so
informed by his attorney. His version of the contract
is corroborated by his brother, Marion Hondell, who tes-
tifies as to being present when it was made and to taking
part in the negotiations, and by his driller, also of the
name of Johnson, who testifies that Owens admitted this
to him after the contract was made. These witnesses and
several others also corroborated him as to the reasonable
profits he could have made, if he had been awarded the
contract for drilling those wells. However on cross-ex-
amination he testifies: "Q. You mean that plaintiff
Owens represented to you that he had a contract for
drilling three deep test wells near Prestonsburg, Floyd
county?" A. "Yes, sir, the contract was not signed up,
but he (Johnson) was to be in the following Wednesday,
and it would be turned over to us. . . . " Q. "Did
you expect to get these wells to drill for some time after
the contract was entered into?" A. "Yes, sir, I have
expected that for nearly a year. . . . " Q. "I be-
lieve you stated on direct examination that Mr. Owens
said that Mr. Johnson had given him a contract to drill
three deep test wells in Floyd county, but that they did
not sign up and he would get them to sign up and deliver
them to you." A. "That is what he said when he first
discussed them and after we made the deal he said he
would have him contract direct to me." Q. "What Mr.
Johnson was that?" Q. "You saw Mr. Johnson after
that did you?" A. "I saw him two different times at
Prestonsburg?" Q. "You talked to him about these
leases?" A. "No, that was after I bought those drills
that I saw Mr. Johnson." Q. "At the time you made
the trade with plaintiff he said Johnson would make a
contract for drilling the wells?" A. "Yes, sir, he
would make it with us." Q. "He, Owens, told you that
he expected to get the contracts?" A. "Yes, sir." Q.
"And that he understood that Johnson was going to drill
those wells and would give you the contract?" A." Yes,
sir." Q. "How long after the trade was made that

you went to see Mr. Fleming (Johnson's agent) about the contracts?" A. "Before the trade was made and after." Q. "Did Mr. Fleming tell you that Mr. Owens had a contract?" A. "Said he presumed Mr. Owens and he had a contract for the work."

It also appears that the well on the Bailey lease came in dry and the petroleum company decided not to drill a second, and paid Hondell $800.00 for the cancellation of that contract. On cross-examination Hondell was asked repeatedly as to his profits on the first well but could not remember whether or not he made anything on it.

On the other hand Owens denies that he had any contract for the drilling of the three additional wells on the Hopkins lease; denies all representations to that effect or any agreement to assign such contract to Hondell, and testifies that he lost money on the two wells that he drilled on that lease and that those to whom the contract was let for the other three wells lost money. A number of witnesses testify that drilling in Floyd county is hazardous and at the prices stated by Hondell there is more likelihood of loss than of gain; that fuel and water are important items in drilling contracts; that a driller cannot afford to arrange for a permanent supply of water for a single well and that this makes the cost of a test well proportionately higher than that of a number of adjoining wells. The manager of the Louisville Gas & Electric Company, a producer, testifies that at the time of the contract mentioned he was paying $2.25 a foot for drilling, and furnishing fuel and water to his contractors and that he made close contracts, though he desired the driller to make a profit, which they could do at that price.

Later Hondell testified again and at this time stated that Owens represented the contract on the Hopkins lease to be $2.25 a foot, with fuel and water furnished. Other evidence was introduced on the various issues, but without unduly extending this opinion we have reached the conclusion that Hondell was not entitled to recover for a breach of the drilling contract.

It is passing strange that a person would agree to pay $8,000.00 for drilling machinery and the right to drill certain wells, and yet pay one-half of the consideration and execute notes for the remainder twelve months later and continue to pay thereon for six months without receiving the drilling contract or making any complaint to

the seller of the failure to receive it, and that athough he had two conversations with the owner of the lease he did not mention the drilling contract to him. It is equally strange that Hondell is able to state without hesitation the amount of profit he would have earned on the wells he did not drill, based on a contract of $2.25 a foot, when he is unable to state that he made any profit on the wells he did drill at $3.00 per foot. It is also significant that in his original deposition he fixed the price of the wells to be drilled at $2.25 a foot, and that after appellant's evidence was introduced, remembered that the contract price was $2.25 a foot with fuel and water furnished. When these inconsistencies are considered in the light of his cross-examination quoted, *supra,* the natural inference is that he knew Owens did not have the contract to drill the additional wells on the Hopkins lease, though it was no doubt hoped that he would secure same. Even if it should be held that the evidence is sufficient to show that Owens represented that he had such contract and agreed to assign his right therein, still the evidence as to the profits he would have earned thereon is so indefinite and contradictory as to make any conclusions thereon highly speculative, and insufficient to authorize a judgment in his behalf and the court erred in so holding. As to the other items in dispute the evidence is conflicting, but without going into details we think it sufficient to uphold the judgment of the lower court.

Wherefore, the appeal of Hondell v. Magoffin Petroleum Company is denied and the judgment of the lower court is affirmed, except as to the $4,500.00 allowed appellee in damages for breach of contract, and as to this the judgment is reversed and cause remanded for proceedings consistent with this opinion.